# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02840-RM-SKC

MARK JANNY,

Plaintiff,

vs.

JOHN GAMEZ, LORRAINE DIAZ DE LEON, JIM (I) CARMACK, TOM (I) KONSTANTY,

Defendants.

_____

DEPOSITION OF MARK JANNY

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Defendants, at the Colorado State Penitentiary, East U.S. Highway 50 and Evans Boulevard, Canon City, Colorado, on July 11, 2019, at 8:44 a.m., before Laura K. McMahon, Registered Professional Reporter and Notary Public.

Electronically signed by Laurie McMahon (001-003-544-4828)    712557c7-2c49-4144-a4f1-ba0b0c06471b

Deposition of Mark Janny

## Page 2

```
1    APPEARANCES:
2    For the Plaintiff:
        (pro se)
3          MARK JANNY, #150344
           Colorado State Penitentiary
4          P.O. Box 777
           Canon City, Colorado 81215
5
6    For Defendant Gamez:
           KATHERINE M. FIELD
7          Assistant Attorney General
           Civil Litigation and Employment Law Section
8          1300 Broadway
           10th Floor
9          Denver, Colorado 80203
           (720) 508-6605
10         Email: kate.field@coag.gov
11
     For Rescue Mission Defendants:
12         DMITRY B. VILNER, ESQ.
           White and Steele, PC
13         600 17th Street
           Dominion Towers, Suite 600N
14         Denver, Colorado 80202
           (303) 296-2828
15         Email: dvilner@wsteele.com
16
17   Also Present:  Armina Malik, Law Clerk
```

## Page 3

```
              EXAMINATION INDEX
By Ms. Field                Page 4, 137, 161
By Mr. Vilner               Page 94, 159

                EXHIBIT INDEX
FOR IDENTIFICATION          INITIAL REFERENCE
Exhibit 1                          4
   4th Amended Prisoner Complaint

Exhibit 2                          11
   Parole Agreement
   (Bates No. CDOC/JANNY-00067)

Exhibit 3                          14
   Sponsor Advisement
Exhibit 4                          18
   Complaint
   (Bates No., CDOC/JANNY-00110)
Exhibit Number 5                   19
   Parole Order
   (Bates No. CDOC/JANNY-00065)
Exhibit Number 6                   20
   Complaint
   (Bates No. CDOC/JANNY-00103)
Exhibit Number 7                   30
   Parole Order
   (Bates No. CDOC/JANNY-00058)
Exhibit Number 8                   30
   Escape Advisement

Exhibit Number 9                   33
   Directives/Lawful Orders
Exhibit Number 10                  40
   Complaint
   (Bates No. CDOC/JANNY-00097)
Exhibit Number 11                  55
   Directive

Exhibit Number 12                  86
   Administration Regulation 850-04
```

## Page 4

                 P R O C E E D I N G S
                    MARK JANNY,
the Plaintiff herein, having been first duly sworn to
state the whole truth, testified on his oath as follows:
                    EXAMINATION
BY MS. FIELD:
    Q   Good morning, Mr. Janny.  My name is
Kate Field, and I represent John Gamez in a lawsuit that
you brought in U.S. District Court, for the District of
Colorado, 16-cv-02840.  I am going to enter the -- a
copy of the Complaint as Exhibit 1, just to start off
with.
        (Exhibit Number 1 was marked)
        MS. FIELD:  All right, Mr. -- and where should
I keep these?
        THE COURT REPORTER:  We'll stash them right
here.
        MS. FIELD:  Okay.
        THE COURT REPORTER:  That's fine.
BY MS. FIELD:
    Q   Can you state -- please state your full name?
    A   Mark Emerson Janny.
    Q   And have you ever had your deposition taken
before?
    A   Yes.

## Page 5

    Q   All right, and what was that case about?  And
for how many times?
    A   Once before.  Prison conditions -- or jail
conditions really.
    Q   Okay.  And when was that deposition taken?
    A   Maybe two months ago.
    Q   So you're fairly familiar with the deposition
process?
    A   Yes.
    Q   Okay.  Just -- I'll just kind of go over some
of the words -- rules.  The court reporter here has just
sworn you in, so your testimony is under oath, just as
it would be if you were in a courtroom.  I will ask
questions, and Dmitry, who is representing the other
Defendants in this case, will also ask you questions.
        And the court reporter is going to be typing
everything down.  So, I think she kind of over -- went
over a little bit, that you -- you are to provide verbal
answers to our questions.
    A   (Nods head)
    Q   Understand?
    A   I do.
    Q   And then as well, speak loudly, because we are
kind of speaking in a more difficult situation, and I --
and -- and use words, like "yes" or "no," instead of

**Page 54**

A   Other than the address. Okay, he told -- okay, he didn't tell me anything about the program, so -- but he told me to go there and check in with the staff, and they would be waiting for me, and they were expecting me, and to go there immediately after we were done.

Q   And you said that he mentioned your -- his -- his friend, Jim?

A   Yes.

Q   And did he ask you, specifically, to check in with Jim or to go --

A   I can't remember if he told me staff or Jim, specifically.

Q   Do you recall what your curfew was set up to be?

A   It was either 6:00 or 8 o'clock --

Q   And (loud noise in background) --

A   -- I think.

THE COURT REPORTER: I'm sorry, the last part?

THE WITNESS: "I think."

THE COURT REPORTER: Thank you.

BY MS. FIELD:

Q   And I'll enter this as Exhibit --

THE COURT REPORTER: 11.

BY MS. FIELD:

**Page 55**

Q   -- 11. You can hand those back to me.

(Exhibit Number 11 was marked)

MS. FIELD: And this is Bates Number 59.

BY MS. FIELD:

Q   Can you tell me what that is?

A   It's a parole directive saying to stay at the -- well, it says stay at 316 Jefferson and to "abide by all house rules." If violated, they will lead to a parole violation -- and to establish my u/a's.

Q   And did -- did he discuss with you what "house rules" meant --

A   No.

Q   -- on -- on February 3rd?

A   No. February 3rd, we did not discuss what the "house rules" meant.

Q   And my understanding is that you had stayed at the Denver Mission before, when it was Open Door?

A   Yeah, I stayed there like overnight, one night.

Q   Did you know it was the same facility?

A   I thought it was the same facility. It really wasn't the same facility, though.

Q   Uh-huh. What do you mean by that?

A   I mean it was the same physical building, but it wasn't the same -- what I was going to wasn't what I

**Page 56**

had gone to, before.

Q   How was it different?

A   Well, I went to the program; whereas, there -- well, first of all, so the overnight shelter doesn't let you in until like sometime at night, I think, right? Like 7 o'clock or something? I went over there at like 3 o'clock in the afternoon, and they were waiting for me to show up.

And there was like a little -- to -- when you walk in the door, there is like a little staff station (indicating). I don't think that was always there. Maybe it was. And then, instead of going to like -- normally, when you slept at the shelter, you slept where people were like, hey, you clear out the tables and sleep there on the floor.

They took me back to like someplace on the left, that had bunk beds -- and set up my stuff there. And then it was like -- wasn't -- it was -- this place was an overnight shelter, before, and what I was going to wasn't an overnight shelter, so much as a residence or a house.

Q   So did you believe that you were going to more of a homeless shelter?

A   Yeah, I thought I was being told to stay at an overnight shelter when I got this.

**Page 57**

Q   Did you --

A   But I also knew something was up when I was told to go there at 3 o'clock when the shelter doesn't open up until like 7:00. It's weird.

Q   Okay. Now, on that directive it says, "Per condition 3 of your Parole Agreement/Order." So that -- that's I think the condition, that you have to abide by orders of your parole officer.

A   Right. I think 3 has two parts. I think the second part is directives, and the first part is abide by all laws --

Q   Okay.

A   -- or something like that.

Q   And do you understand this directive as making sure that you are in compliance with Condition 2, which is requiring you a residence -- to have a residence of record?

A   Not so much, because I mean, if residence -- when -- if you were -- like, so if it was just a "residence of record" kind of thing -- there is two homeless shelters in Fort Collins, and usually like -- before I was offered the choice, when I got this kind of thing -- you are either going to stay at this homeless shelter or this homeless shelter as your residence. You know what I mean? And that might be what that other

## Page 70

1  A  Yep.
2  Q  And then what?
3  A  I remember I talked with some people. I don't
4  remember -- I -- I don't remember talking -- feel like I
5  talked to either Carmack or Konstanty, but I can't
6  remember specifically who. And we didn't talk about --
7  and I don't think it was Carmack. I don't -- I am not
8  sure if Carmack was there when I came, when I showed up.
9      But I talked -- there were staff members, and
10  they were kind of the ones. But at this time, I still
11  didn't know it was a religious program. I still didn't
12  know it was a program. I thought it was just like a
13  nicer place to stay in the shelter at this point.
14  Q  When did you realize it was --
15  A  The next day.
16  Q  The next day?
17  A  The next day, when I was being oriented,
18  orientated.
19  Q  Okay, so you were just hanging out from
20  3:00 p.m., until the next day, in that bunk bed room?
21  A  No. We ate dinner.
22  Q  Do you know what time you ate dinner?
23  A  No. 5:30, 6:00, something like that.
24  Q  But the other people, in the bunk bed room,
25  didn't go to any religious programming that day?

## Page 71

1  A  You know, I might have -- I don't even know.
2  I might have left at that time and went outside and
3  just -- it was downtown Fort Collins, and I was still
4  getting acclimated.
5      I don't know. I didn't know -- I didn't
6  realize there was a program at this point. Like I
7  didn't realize that this was a thing I was in. I
8  thought this was just the shelter's doing at this point,
9  and it was being given. That was just the nicer
10  shelter, a nicer part of the shelter. Then the next --
11  the next day?
12  Q  Sure.
13  A  Okay. The next day I was told to come back,
14  so -- I was told to come back by Gamez for a parole
15  meeting the next morning. So I left it --
16  Q  Sorry, he --
17  A  -- don't tell anyone --
18  Q  He told you to come back?
19  A  The next morning.
20  Q  So, when you were leaving on February 3rd, he
21  told you, come back February 4th?
22  A  Yes.
23  Q  Okay.
24  A  One of them. So, you know, still not thinking
25  of anything, I just leave, because I didn't know that I

## Page 72

1  wasn't just supposed to leave without -- I leave and go
2  have my parole office visit.
3      Standard stuff. No problems. No issues are
4  raised. You know, I see my curfew isn't adjusted. It's
5  still whatever it was at, like 6:00 or 8 o'clock. I
6  don't think there was any problem with this yet. I
7  can't remember what the meeting was about.
8      So I go back, and that's when I get
9  oriented -- that's when Jim, and Mark Konstanty, or --
10  yeah, that's when the two Rescue Mission Defendants,
11  basically -- I get confronted, first, by Jim for
12  leaving.
13      "Well, I have a parole office visit. What are
14  you -- like what are you talking about? I am going to
15  take care of this stuff."
16      And he is like, well, I want to know where you
17  go when you're leaving.
18      And then he starts telling me about the
19  program. I am like, well, I don't know -- I basically
20  tell him: I don't want to hear it. I am an atheist.
21      You know, I -- you know? And he is like,
22  well, you're not going to -- not here -- don't talk
23  about being an atheist if you're in here, and you're
24  going to still do these Bible studies and these prayers
25  and talk with me about religion. And I am like, well,

## Page 73

1  no, I am not, that's -- he is like: Yes, you are or you
2  are going to be kicked out.
3      I am like, that's a violation of my rights,
4  man. He said, well, you don't have religious rights
5  here.
6      And then -- then he -- what did he say? Mark
7  was brought into the conversation at some point, and I
8  told him I was an atheist. And basically it was like,
9  you know, you're going to be here or you're going to --
10  I was told, you're going to be here and you're going to
11  do the program, or you're going to go to jail.
12      And I, you know, basically said: I really
13  doubt that. That would be -- you know, that's not how,
14  you know, the U.S. works. That's not how the United
15  States works. You know, it's one of the most -- it's
16  like the first precept of the nation. That's not how
17  this works.
18      So, he called my parole officer, Jim did. And
19  they talk, and he tells them that I am saying I am an
20  atheist and I am not fit for the program and I am not
21  going to do a religious program, meaning -- and,
22  basically, gets reassured by Gamez that I will do the
23  programming, that I will abide by the rules or I will go
24  to jail -- and that I will do whatever is necessary to
25  stay in the program or else I'll be sent to jail.

19 (Pages 70 to 73)

**Page 82**

Q  And did that happen before or after you kind of got the broader orientation as to the program?

A  That happened at like 6:00 a.m., first thing in the morning.

Q  So, even when that was happening, you weren't aware that this was a program, quote, unquote?

A  No, because you all come together like the -- the -- to wake up the people that are in the other room. You eat where all of those people are sleeping, so all of those other people are there, too.

Q  Okay.

A  But you know, the only people, that get called for roll call, are the people -- the only people, that have to attend that, are the people that are in the program.

So, if all the other people -- not all the other people, but some of the other people, that were there on the floor, are there -- because they are waiting to get their breakfast --

Q  Gotcha.

A  -- but the only people, that have to be there, is the (loud noise in background) -- people that are in the program. And I am on --

THE COURT REPORTER:  Wait.  Timeout. "But the only people, that have to be there"?

**Page 83**

THE WITNESS:  The only people, that have to be there, are the people in the program, and my name was called that morning as a part of the roll call.

BY MS. FIELD:

Q  All right, so going back to that second parole office meeting. You said you informed them that you were an atheist. What -- what was Defendant Gamez's response?

A  "It doesn't matter.  You're going to follow the rules of the program or you're going to go to jail."

Q  Did -- did you guys discuss, specifically, the -- the program rules at that --

A  Yeah. We -- we discussed what was expected. We discussed the Bible studies. We discussed -- I brought these things up, the Bible studies, the morning prayer, the daily chapel -- at which point, Jim says he wants me at the daily chapel and he wants to make sure I am there.

So that's when they adjust my curfew, from 6:00 to 4:30, so they can assure my attendance at these daily chapels.

Q  So you walked through all the different program rules?

A  (Nods head) And the end result is:  You're either going to be in the program, you're going to --

**Page 84**

you know, you are supervised under Jim -- or you can choose to go to Washington County and wait for your parole office -- you can wait for your parole hearing in Washington County.

I think we also discussed the fact that I am not allowed to get a job at this time -- because in the morning -- in the morning, when we talked about me doing things I am supposed to do on the parole, like getting a job and that -- and that was good, everything was okay with that -- but then, after this talk with Jim, they don't want me to get a job anymore. They just want me to kind of hang out at the -- at the Rescue Mission all day -- and just wait for my parole hearing, to just kind of relax and unwind, they say.

Q  So, in your Complaint, you -- you mention -- you say in Paragraph 21 that you told Defendant Gamez that you didn't want to be in the program -- at that first parole hearing at 9:00 a.m. -- but I think what you're saying now is that you didn't really understand that there was a program until that second parole meeting?

A  I didn't want to be in anything. Like I -- I was put in a special room and told to be -- you know what I mean? But I didn't notice there was anything different. Like I thought it was the same. But I

**Page 85**

didn't want to be there.  I told them I still didn't want to be there, because I didn't.  I didn't want to be at a homeless shelter.  I didn't want to be at the program.  I didn't want to be at the Denver Rescue Mission.  I wanted to be in a residence.

Q  But there was no residence for you to go to, other than a homeless shelter?

A  Yes, there was.

Q  What was that?

A  Cassy Warembourg's house.

Q  But she had -- her residence hadn't been approved, correct?

A  And it wasn't going to be looked into because he didn't want to look into it.

Q  Okay.

A  I need to use the restroom.

Q  Okay, I -- is that allowed?

A  Yes.

MS. FIELD:  Do you want to go off the record?

THE COURT REPORTER:  (Nods head)

(Brief recess was taken from 10:39 a.m. to 10:55 a.m.)

BY MS. FIELD:

Q  I am going to change topics a little bit on you. Are you familiar with the DOC, the Colorado

**102**

1  Q  Can you describe the Bible study? Who was
2  there? What did you talk about? How is it set up?
3  A  Huh, I can --
4  Q  Maybe -- maybe I should go with specific
5  questions. So, the Bible study was after dinner on
6  February 4th?
7  A  Maybe not right after dinner but after dinner.
8  Q  Okay. Do you know about what time of the day
9  that would have been?
10 A  Sometime between, I don't know, 7:00 and 8:00
11 maybe? And 8:00 to 9:00? 7:00 to 9:00?
12 Q  Who was leading the Bible study?
13 A  Tom Konstanty.
14 Q  Okay. What did Tom Konstanty look like? Can
15 you describe him?
16 A  White male; five, eight; brown hair. Maybe
17 balding a little. A jovial guy. You know, not unhappy,
18 not dour.
19 Q  Did you ever see Tom Konstanty speak with
20 Officer Gamez?
21 A  (No response)
22 Q  Did you ever see them meet in person?
23 A  They definitely didn't meet in person, that I
24 am aware of.
25 Q  Okay.

**103**

1  A  I never saw that.
2  Q  Did you witness Tom Konstanty on the phone
3  with Officer Gamez?
4  A  I can't remember. Might have been during that
5  first time, when he was speaking with Carmack, but I
6  don't think so because it was Carmack and Gamez, that
7  had a previous relationship, not Carmack and Konstanty.
8  Q  Not Gamez and Konstanty you mean?
9  A  Gamez and Konstanty (nods head).
10 Q  So, to your knowledge, Mr. Konstanty never
11 spoke with or met with Officer Gamez?
12 A  I can't say for sure. Well, I mean, to my
13 knowledge -- I guess, to my knowledge, I don't know. I
14 don't know. I can't say that they did. I can't say
15 that they didn't.
16 Q  Can you recall them ever meeting or speaking
17 on the phone with each other?
18 A  I cannot.
19 Q  Okay.
20 A  If they did -- you know, they might have done
21 it that first time, but I -- but yeah. Okay, I can
22 mostly remember -- what I do remember, clearly, is
23 Carmack --
24 Q  Okay.
25 A  -- speaking with Gamez.

**104**

1  Q  But you do not remember Konstanty speaking
2  with Gamez?
3  A  Although, he knew -- when we had a
4  conversation, she knew what had been said between all
5  parties.
6  Q  And how do you know that?
7  A  Because we discussed it.
8  Q  Explain those discussions.
9  A  Well, for instance, at that Bible study that
10 night. The line, that Marshawn Lynch line, "I am just
11 here so I don't get fined" -- he knew that I was in the
12 program, because I had to be, or else I was going --
13 threatened to go to jail. He knew that I was at the
14 Bible study because, if I wasn't at the Bible study, I
15 was going to go to jail or be kicked out of the program
16 and go to jail.
17 Q  Okay, there is --
18 A  Um --
19 Q  Go ahead.
20 A  I walked in the building one of those days,
21 and he said, well, this is the first time I have seen
22 you smile since you have been here, and are you starting
23 to -- like, you know, is the place growing on you?
24    I said: No. I am still just as much a
25 prisoner here as every -- ever.

**105**

1  Q  And what did he say after that?
2  A  Nothing I can remember.
3  Q  What day was that?
4  A  From one of the afternoons I came back. I
5  don't know, it was after -- it was after -- before --
6  before the 8th.
7  Q  Okay, after you came back from what?
8  A  I was out of the building.
9  Q  Okay, what were you doing?
10 A  Making a phone call.
11 Q  When you say you were "out of the building,"
12 were you outside, had stepped out of the building?
13 A  Yes.
14 Q  Did you check in with anyone?
15 A  Did I check in with anyone when I left?
16 Q  Before you left?
17 A  No.
18 Q  Were you disciplined for leaving the building?
19 A  I was told at one point, if you break any more
20 rules, we are going to kick you out of the program --
21 program. That was by Carmack on the morning of the 7th
22 or 8th.
23 Q  Did he tell you that after you stepped out of
24 the building?
25 A  Which time?

106

1  Q  The time you just mentioned, you stepped out
2  of the building to make a phone call and then you came
3  back in.
4  A  No, he didn't tell me that after that
5  happened.
6  Q  Okay. So I believe you had testified earlier
7  that you had to be in the shelter, between 6:00 and
8  4:30, because they wanted you to do chores; is that
9  correct?
10  A  They wanted me in the shelter to work for them
11  between 6:00 and 4:30.
12  Q  Okay.
13  A  I was pretty much compliant -- non-compliant
14  with this whole thing the whole way. I wasn't going to
15  be their janitor, man. They weren't going to force me
16  to work for them for free while I paid for this. You
17  know, I wasn't going to do that.
18  Q  What did you do instead?
19  A  Moped around a lot. Sometimes I would do
20  chores. I would try to sneak away when I could.
21  Q  What do you mean by, "sneak away"?
22  A  Like take steps outside, go, just leave.
23  Q  For how many minutes or hours would you leave
24  at a time?
25  A  Not that long. I had nowhere to go. I -- I

107

1  couldn't go anywhere substantial. I couldn't really go
2  do things, you know?
3  Q  Did you ever try to find a job?
4  A  I wasn't allowed to find a job. I had a job
5  lined up, but then I was told by both, Mark and Jim,
6  that I couldn't work.
7  Q  And when did they tell you that?
8  A  Probably on the 4th.
9  Q  Did you bring that up with Gamez?
10  A  I did.
11  Q  And what did Gamez say about that?
12  A  "Just follow the program rules."
13  Q  And your understanding is that the program
14  rules do not allow you to work?
15  A  It was also: Listen to whatever these guys
16  say, follow the rules and listen to what these people
17  say.
18  Q  Okay, but the program rules --
19  A  Yeah.
20  Q  -- to your understanding, did not allow you to
21  search for work or, if you have work, to -- to perform
22  that work?
23  A  They didn't allow me to work. That's what I
24  was told by Jim and Mark. They wanted me to just hang
25  out and decompress and wait for my parole.

108

1  So I don't know -- I mean, since there are no
2  real like written rules, that I got a pamphlet of, the
3  rules are whatever they decided the rules were.
4  Q  You said that there were maybe 10 to 12 other
5  people in -- in the program?
6  A  Uh-huh.
7  Q  Did you observe any of them leaving during the
8  day?
9  A  Yes. All of them were allowed to leave.
10  THE COURT REPORTER: I'm sorry, "All of them
11  were"?
12  THE WITNESS: All of them were allowed to
13  leave.
14  BY MR. VILNER:
15  Q  But to your understanding, you were not
16  allowed to leave?
17  A  No. I was supposed to stay there and just
18  hang out.
19  Q  But you would leave on occasion?
20  A  Yes.
21  Q  Okay. And you recall that Jim Carmack told
22  you, if you break any more rules, I am going to kick you
23  out?
24  A  Yes.
25  Q  And he said that on February 7th?

109

1  A  Or 8th, one of the two.
2  Q  Or -- or 8th?
3  A  Yeah.
4  Q  When was your last day at the shelter?
5  A  8th, the 8th. He said that to me in the
6  morning -- then time to go out to go to an
7  outside-the-thing church service -- and I wasn't going
8  to go to that, so I didn't go to that. Came back and
9  told him, I am not going to that and I am not going to
10  chapel later on -- that was around 4:30 -- and he kicked
11  me out.
12  Q  Okay. What do you mean by kick you out?
13  A  Told me I couldn't be there and I had to
14  leave.
15  Q  And then what did you do?
16  A  Got my stuff and left.
17  Q  And where did you go?
18  A  To Cassy Warembourg's.
19  Q  How -- Cassy Warembourg lives in Loveland,
20  correct?
21  A  She does.
22  Q  How did you get to her house?
23  A  I got drove there.
24  Q  And who drove you there?
25  A  Chase Borkowski.

28 (Pages 106 to 109)

Calderwood-Mackelprang, Inc.   303.477.3500

110

1  Q  Okay, who is Chase Borkowski?
2  A  He is my son's uncle.
3  Q  Okay. Your son's uncle?
4  A  Yes.
5  Q  So is he --
6  A  Not my brother, either. Brother to his --
7  brother -- my son's mom's brother.
8  Q  Okay.
9     THE COURT REPORTER: Can you spell his last
10    name, please?
11    THE WITNESS: B-o-r-k-o-w-s-k-i.
12    THE COURT REPORTER: Thank you.
13 BY MR. VILNER:
14  Q  So did you call Mr. Borkowski?
15  A  No.
16  Q  How did you get in contact with Mr. Borkowski?
17  A  He came to see me that day.
18  Q  And that was at the same time that you picked
19 up your stuff and left?
20  A  He was outside when that happened.
21  Q  Okay. Did he come inside the shelter?
22  A  Yeah.
23  Q  Can you describe the conversation you had with
24 him when he came inside the shelter?
25  A  With him?

111

1  Q  Yeah.
2  A  No. Who knows what they were talking -- they
3 might have been talking about Taylor Swift, for all I
4 know.
5  Q  Okay. At what point did you decide to leave?
6  A  When I was told to.
7  Q  So you were told by Mr. Carmack to leave while
8 Mr. Borkowski was in the shelter?
9  A  Yes.
10  Q  Okay. Did Mr. Carmack speak with
11 Mr. Borkowski?
12  A  No.
13  Q  Okay. What, to the best of your recollection,
14 did Mr. Carmack say to you --
15  A  "You can't be" --
16  Q  -- that you interpreted as kicking you out?
17  A  "You can't be here anymore. You have to
18 leave. If you're not going to -- you're not doing what
19 we're telling you -- we're not -- you're not doing what
20 we're you're telling me -- what we are telling you, you
21 have to -- so you have to go."
22  Q  Did he just walk into your room and say that?
23  A  No. I walked into the building. And it --
24 the staff office --
25  Q  Huh.

112

1  A  -- and our rooms are right next to each other.
2 You know what I mean? Like their door is open and --
3 right in front of the area.
4  Q  Okay. All right. So he described what led up
5 to that conversation?
6  A  In the morning he had told me that, if I won't
7 follow the rules, that, I can't be here.
8  Q  Okay. And then what happened?
9  A  I proceeded to not go to the outside, this --
10 outside-of-the-thing church service -- and I told him
11 that I wasn't going to go to chapel that night, and he
12 told me I had to go.
13  Q  And that all happened at the same time?
14  A  No. That happened at two distinct points in
15 the day. One happened in the morning, and one happened
16 at like 4:30.
17  Q  Okay. So the morning conversation was when
18 you were told to go to church?
19  A  And follow the rules or I would --
20  Q  And follow all the rules or you will be kicked
21 out?
22  A  Yes.
23  Q  Okay. And that was the end of your
24 interaction with Mr. Carmack that morning?
25  A  Yes.

113

1  Q  Okay. And what happened --
2  A  And that was the day we had the -- I don't
3 think it was, but that could have been the day we had
4 the meeting in his office.
5  Q  Describe the meeting in his office. What are
6 you referring to?
7  A  No, he brought me in there for religious
8 counseling, asked me why I was an atheist, and then he
9 talked about a bunch of Bible stuff and how it was
10 written, and the words were lost in translation, and how
11 the Greeks had like -- it was either -- it was Greek or
12 maybe Hebrew -- had like six different words for sin;
13 well, English only had one.
14     And then he gave me that -- you know, the
15 scenario where you -- like, if you believe and it's
16 true, this happens. If you believe it's not true, this
17 happens. If you don't believe and it's true, then this
18 happens. If you don't believe and it's not true -- and
19 that kind of scenario. And he is, basically, giving me
20 a bunch of -- I don't know, was trying to convert me to
21 Christianity.
22  Q  You interpreted it as him converting you to
23 Christianity?
24  A  Well, yes. Yes, I did.
25  Q  Okay. So you had that meeting with him also